UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

In re                                                                          Chapter 7

     ATLANTIC 111ST LLC,                             Case No. 8-19-73137 (reg)

         Debtor.

-----------------------------------------------------------------------x

**STIPULATION AND ORDER, PURSUANT TO BANKRUPTCY RULE 9019 AND
SECTIONS 105, 362, 363, 364, AND 502 OF THE BANKRUPTCY CODE,
(I) SETTLING AND ALLOWING THE CLAIMS OF MLF3 ATLANTIC LLC; (II)
DETERMINING THAT MLF3 ATLANTIC LLC HAS VALID FIRST AND SECOND
PRIORITY LIENS ON THE DEBTOR'S PROPERTY; (III) DIRECTING THE SALE OF
THE DEBTOR'S REAL PROPERTY; AND (IV) GRANTING RELATED RELIEF**

        This stipulation and order (the "**Stipulation**") is entered into by and between (i) Kenneth

Silverman (the "**Trustee**"), as Chapter 7 trustee of the estate of Atlantic 111st LLC, by the above-

captioned debtor (the "**Debtor**"), and (ii) MLF3 Atlantic LLC (the "**Lender**"). The Trustee and

the Lender are sometimes collectively referred to herein as the "**Parties**" and are sometimes each

individually referred to as a "**Party**".

**RECITALS**

**I.**      **The Loans Against The Real Property**

        **A.**     On May 3, 2011, the Debtor duly executed, acknowledged and delivered to Edul

N. Ahmad ("**Edul**") that certain Purchase Money Note dated May 3, 2011 (the "**First Note**")

evidencing a loan in the original principal amount of $2,000,000.00 (the "**First Loan**"), pursuant

to which First Note the Debtor covenanted and agreed to repay Edul the principal amount of

$2,000,000.00, together with interest thereon and such other amounts as set forth in the First Note.

        **B.**     As security for the First Note, on May 3, 2011, the Debtor duly executed,

acknowledged and delivered to Edul that certain Purchase Money Mortgage dated May 3, 2011

(the "**First Mortgage**"), pursuant to which First Mortgage the Debtor granted Edul a first priority mortgage and lien on, among other things, the real property located at 110-19 Atlantic Avenue, Richmond Hill, New York 11418 (Block 9317, Lot 21) together with all buildings, improvements and fixtures thereon (the "**Atlantic Property**"), all leases and rents related to the Atlantic Property, and all proceeds of all the foregoing.

C.       As further security for the First Note, on May 3, 2011, Jarnail Singh , an individual whose primary residence is located at 95-25 120th Street, South Richmond Hill, New York (the "**Guarantor**") duly executed, acknowledged and delivered to Edul that certain Continuing Guaranty dated May 3, 2011 (the "**Guaranty**"; and together with the First Note and the First Mortgage are collectively referred to herein as the "**First Loan Documents**"), pursuant to which Guaranty the Guarantor guaranteed payment to Edul of all obligations under, among other things, the First Note and First Mortgage. The Guarantor and the Debtor are sometimes collectively referred to herein as the "**Obligors**".

D.       On May 3, 2011, the Debtor duly executed, acknowledged and delivered to Edul a certain Second Mortgage Note dated May 3, 2011 (the "**Second Note**") evidencing a second loan in the original principal amount of $490,000.00 (the "**Second Loan**"), pursuant to which Second Note the Debtor covenanted and agreed to repay Edul the principal amount of $490,000.00, together with interest thereon and such other amounts as set forth in the Second Note (the "**Second Loan**"). The First Loan and the Second Loan are sometimes collectively referred to herein as the "**Loans**").

E.       As security for the Second Note, on May 3, 2011, the Debtor duly executed, acknowledged and delivered to Edul a certain Second Mortgage dated May 3, 2011 (the "**Second Mortgage**"), pursuant to which Second Mortgage the Debtor granted Edul a second priority

2

mortgage and lien on, among other things, the Atlantic Property, all leases and rents related to the Atlantic Property, and all proceeds of all the foregoing.

**F.**     As further security for the Second Note, on May 3, 2011, the Guarantor guaranteed payment of all obligations under, among other things, the Second Note and Second Mortgage pursuant to the Guaranty.

**G.**     As further security for the Second Note, on May 3, 2011, (i) the Guarantor, (ii) Satya Kaur, an individual and the wife of the Guarantor ("**SK**"), and (iii) BMSL Management LLC ("**BMSL**") duly executed, acknowledged and delivered to Edul a Collateral Mortgage dated May 3, 2011 (the "**Collateral Mortgage**"; and together with the Second Note, the Second Mortgage, the Guaranty are collectively referred to herein as the "**Second Loan Documents**"), pursuant to which the Guarantor, SK and BMSL granted Edul a first priority mortgage and lien on, among other things, (i) the real property commonly known as 131-09 Hillside Avenue, Richmond Hill, New York 11418 (Block 9252, Lot 28) together with all buildings, improvements and fixtures thereon (the "**Hillside Property**"), (ii) the real property commonly known as 95-25 120th Street, Richmond Hill, New York 11419 (Block 9458, Lot 41) together with all buildings, improvements and fixtures thereon (the "**120th Street Property**"; and together with the Atlantic Property and the Hillside Property are collectively referred to herein as the "**Properties**"),  (iii) all leases and rents related to the Hillside Property and the 120th Street Property, and (iv) all proceeds of all the foregoing. The First Mortgage, the Second Mortgage, and the Collateral Mortgage are sometimes collectively referred to herein as the "**Mortgages**").

**H.**     On May 3, 2011, Edul duly assigned the First Note, the First Mortgage, and any other First Loan Documents to Bibi N. Ahmad ("**Bibi**"), pursuant to, among other things, an Assignment of Mortgage without Covenant, dated May 3, 2011 (the "**Bibi First Mortgage Assignment**").

**I.**     On April 11, 2016, Bibi duly assigned the First Note, the First Mortgage, and any other First Loan Documents to the Lender, pursuant to, among other things, an Assignment of Purchase Money Mortgage, dated April 11, 2016 (the "**First Mortgage Assignment**").

**J.**     The assignment of the First Note to Lender is also evidenced by an Allonge dated April 11, 2016, duly indorsed by Bibi payable to the order of Lender and affixed to the First Note.

**K.**     On May 3, 2011, Edul duly assigned the Second Note, the Second Mortgage, and the other Second Loan Documents to Bibi as evidenced by, among other things, an Assignment of Mortgage Without Covenant, dated May 3, 2011 (the "**Bibi Second Mortgage Assignment**").

**L.**     On April 11, 2016, Bibi duly assigned the Second Note, the Mortgage, and the Second Loan Documents to the Lender, as evidenced by, among other things, an Assignment of Second Mortgage, dated April 11, 2016 (the "**Second Mortgage Assignment**").

**M.**     The assignment of the Second Note to the Lender is also evidenced by an Allonge dated April 11, 2016, duly indorsed by Bibi payable to the order of Lender affixed to the Second Note.

**N.**     On May 3, 2011, Edul duly assigned the Collateral Mortgage to Bibi as evidenced by an Assignment of Collateral Mortgage, dated May 3, 2011 (the "**Bibi Collateral Assignment**").

**O.**     On April 11, 2016, Bibi duly assigned the Collateral Mortgage to the Lender, as evidenced by an Assignment of Collateral Mortgage, dated April 11, 2016 (the "**Collateral Assignment**").

**P.**     On April 11, 2016, Bibi duly delivered to the Lender an Omnibus Assignment and Assumption Agreement dated April 11, 2016 (the "**Omnibus Assignment**"). The First Loan Documents, the Second Loan Documents, together with the Omnibus Assignment and all allonges, and other assignments set forth herein above are collectively referred to herein as the "**Loan**

**Documents**".[1]  Pursuant to the Omnibus Assignment, among other things, the Loan Documents were duly assigned to the Lender.

    **Q.**    All of the Loan Documents have been duly filed and recorded in all necessary governmental offices in order to perfect the mortgages and liens granted thereunder.

    **R.**    The Lender is the due and proper holder and owner of all of the Loan Documents and is entitled to exercise any and/or all of its remedies thereunder.

**II.**    **Pre-petition Litigation With The Debtor**

    **A.**    The Debtor defaulted under the terms and provisions of Loan Documents by failing to repay the monthly principal and interest payment due July 1, 2011 and each month thereafter, constituting an event of default under the Loan Documents (the "**Initial Defaults**").

    **B.**    Obligors and Bibi entered into a certain Forbearance Agreement dated June 1, 2012 (the "**Forbearance Agreement**") concerning the Initial Defaults.

    **C.**    The Obligors thereafter defaulted under the Forbearance Agreement by failing to make the payments due and payable pursuant to the Forbearance Agreement (the "**Forbearance Defaults**"), and by letter dated September 28, 2015 Bibi gave due and proper notice to the Obligors of the Obligors' Forbearance Defaults.

    **D.**    On or about December 30, 2015, Bibi duly declared the balance of the principal indebtedness immediately due and payable and commenced a foreclosure action in the New York State Supreme Court, Queens County (the "**State Court**") respecting the First Loan by filing a Summons and Complaint under Index No. 713435/2015 in the matter originally styled *Bibi N. Ahmad v. Atlantic 111st LLC, et. al*. (the "**First Foreclosure Proceeding**").

---

[1] Copies of the relevant Loan Documents are annexed to POC No. 2 (defined herein) and POC No. 3 (defined herein), as applicable.

**E.**     Harbans Singh ("**Harbans**") was named a party defendant based on his claim against the Debtor in a lawsuit filed in the State Court under Index No. 4550/2014 that he owned a fifty percent (50%) interest in the Atlantic Property.

**F.**     Pursuant to a Deed dated May 18, 2011, and recorded with the City Register on May 18, 2018 ( the "**Harbans Deed**"), the Debtor transferred one-half of its interest in the Atlantic Property to Harbans.

**G.**     Pursuant to a Deed dated September 18, 2019 (the "**Harbans/Commons Deed**"), which Harbans/Commons Deed the Debtor and the Guarantor intentionally kept secret from all third parties and caused to be unrecorded until September 2020, Harbans secretly transferred one-hundred percent (100%) of Harban's interests in the Atlantic Property (i.e. Harban's fifty percent (50%) interest therein) to Atlantic Avenue Commons LLC ("**Commons**").

**H.**     Commons is a limited liability, whose alleged single member is Jay Yakow, Esq, ("**Yakow**"). Yackow is the long time attorney for the Guarantor and the Guarantor directly or indirectly controlled Commons. The Guarantor intentionally hid, from third parties and the Bankruptcy Court (defined below), the Guarantor's direct or indirect interest in and control of (i) Commons, (ii) the Harbans/Commons Deed, (iii) the unsecured claim that Commons filed against the Debtor in the Debtor's Chapter 11 case in order to deceitfully attempt to use Commons as a shill to be the sole, purported impaired claim so as to potentially enable the Debtor to confirm a cram down plan of reorganization over the objections of the Lender.

**I.**     Pursuant to a Deed dated August 24, 2020, Commons transferred one-hundred percent (100%) of Commons' interest in the Atlantic Property (i.e. Commons fifty percent (50%) interest therein) to the Debtor (the "**Commons/Debtor Deed**"). The Harbans/Commons Deed and the Commons/Debtor Deed were recorded in September 2020.

**J.**     As of the date hereof the Debtor is the sole owner of 100% of the Atlantic Property.

**K.**     The Obligors, Harbans, and Richie Rich Palace NY Inc., a/k/a Richi Rich Restaurant ("**RR**") each filed an Answer in the First Foreclosure Proceeding.

**L.**     The State Court granted summary judgment in favor of Lender in the First Foreclosure Proceeding pursuant to an Order of Reference dated March 8, 2018.

**M.**     The State Court granted Lender a Judgment of Foreclosure and Sale, dated February 7, 2019, in the First Foreclosure Action which was duly entered by the County Clerk of the Supreme Court, Queens County on February 27, 2019 (the "**Foreclosure Judgment**"), and a notice of entry of the Foreclosure Judgment was duly filed with the State Court on February 28, 2019. No person appealed the Foreclosure Judgment and the time to do so has expired. The Foreclosure Judgment is final and non-appealable.

**N.**     The Foreclosure Judgment granted a money judgment in favor of Lender in the amount of (i) $3,082,214.20 as of June 20, 2018 (the "**Principal/Interest Portion of Judgment**")[2]; plus (ii) $51,375.00 as of June 20, 2018 (the "**Attorneys' Fees Portion of Judgment**"); plus (iii) interest on $3,082,214.20 at the rate of 12% per annum from June 20, 2018 until the date that all obligations under the First Loan Documents are paid in full by the Debtor; plus (iv) all protective advances and all reasonable attorneys' fees and expenses incurred by the Lender after June 20, 2018, plus interest thereon at the rate of 12% per annum from the date of payment thereof or advance by Lender until the date that all obligations under the First Loan Documents are paid in full by the Debtor; plus (v) $2,310.00 in costs and disbursements in the First Foreclosure Proceeding, plus interest on $2,310.00 at the rate of 12% per annum from June 20, 2018 until the

---

[2] The amount of $3,133,589.20 is sometimes referred to herein as the "**Base Judgment Amount**", and represents the sum of (i) the $3,082,214.20 Principal/Interest Portion of Judgment, plus (ii) the $51,375.00 Attorneys' Fees Portion of Judgment.

date that all obligations under the First Loan Documents are paid in full by the Debtor; plus (vi) $750.00 in fees to the referee in the First Foreclosure Proceeding.

O.     Pursuant to the Foreclosure Judgment and the Memorandum decision of Justice Leonard Livote dated August 10, 2017 and filed on September 1, 2017, the State Court expressly ruled, among other things, (i) that the Harbans Deed was recorded after the First Mortgage was recorded and therefore is subordinate to the First Mortgage and (ii) the Lender can foreclose on it First Mortgage free and clear of the any interests of the Debtor, Harbans and RR in the Atlantic Property.

P.     On or about September 9, 2016, Lender commenced a second foreclosure action in the State Court respecting the Second Loan under Index No. 710813/2016 in the matter styled *MLF3 Atlantic LLC v. Atlantic 111st LLC, et al.* (the "**Second Foreclosure Proceeding**").

## III.     The Debtor's Bankruptcy Filing

A.     On April 18, 2019 (the "**Petition Date**"), one (1) day prior to a scheduled foreclosure sale of the Atlantic Property in the First Foreclosure Proceeding, the Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**").

B.     The Lender timely filed in the Debtor's bankruptcy case: (i) a Proof of Claim with respect to the First Loan in the secured amount of $4,056,801.88 as of the Petition Date, plus interest, protective advances and attorneys' fees and expenses as set forth therein all of which continue to accrue, which Proof of Claim was assigned Claim Number 2 on the Claims Register maintained by the Bankruptcy Court ("**POC No. 2**"); and (ii) a  Proof of Claim with respect to the Second Loan in the secured amount of $350,674.56 as of the Petition Date, plus interest, protective advances and attorneys' fees and expenses as set forth therein all of which continue to accrue, and

such claim was assigned Claim Number 3 on the Claims Register maintained by the Bankruptcy Court ("**POC No. 3**"; and together with POC No. 2 are collectively referred to herein as the "**Proofs of Claim**").

C.    On or about October 23, 2019, the Debtor filed with the Bankruptcy Court a motion objecting to the Lender's Proofs of Claim and alleged, among other things, the existence of a so called Modification Agreement, dated February 4, 2014, which the Debtor asserted was signed by Bibi (the "**Claims Objection Motion**").

D.    The Lender disputes all of the allegations contained in the Claims Objection Motion and Lender and has asserted, among other things, that Bibi never signed the Modification Agreement, Bibi's signature on the purported Modification Agreement is forgery, and that the Debtor is defrauding this Court by asserting the existence of such agreement.

E.    On or about June 30, 2020, the Debtor filed with the Bankruptcy Court its Fifth Amended Disclosure Statement (the "**Disclosure Statement**") and its Fifth Amended Plan of Reorganization (the "**Plan**").

F.    On July 22, 2020, the Lender filed, among other things, an Objection to the Debtor's Plan.

G.    On July 28, 2020 counsel for the Debtor advised the Bankruptcy Court that the Debtor did not have the funds needed to proceed to confirmation of the Plan.

H.    At a July 29, 2020 hearing to consider confirmation of the Debtor's Plan, the Debtor advised the Bankruptcy Court, among other things, that (i) the Plan could not be confirmed, (ii) the Debtor irrevocably withdrew its Plan, and (iii) the Debtor was in the process of obtaining and recording the Commons/Debtor Deed.

**I.**     Following the July 29, 2020 hearing the Debtor and the Lender attempted to negotiate a settlement. However, the settlement discussion failed when, among other things, the Guarantor caused BMSL to file its own Chapter 11 petition on October 14, 2020 and the Guarantor failed to pay monies to the Lender that it promised to pay.

**J.**     On November 18, 2020 the Bankruptcy Court entered an order converting the Debtor's Chapter 11 case to a Chapter 7 case.

**K.**     On November 18, 2020 Kenneth Silverman was appointed as the interim Trustee of the Debtor and he thereafter qualified and is serving as the permanent Chapter 7 Trustee of the Debtor.

**L.**     On December 18, 2020, the Trustee held the initial Bankruptcy Code §341 meeting of creditors.  Subsequently, the Trustee was duly qualified as the permanent trustee and is currently acting in that capacity.

**M.**     The Trustee commenced an adversary proceeding against RR and the Guarantor on December 22, 2020, in which the Trustee seeks, among other things, a declaratory judgment that neither RR nor the Guarantor has any lease with respect to the Atlantic Property or any right to use or occupy the Atlantic Property (the "**RR Adversary Proceeding**").

## IV.     The Lender's Claims and this Stipulation

A.     On account of the First Loan, First Loan Documents and POC. No.2, the Lender asserts a first priority secured claim against the Atlantic Property and the Lender's other collateral in the amount in excess of $5.1 million (the "**Asserted First Priority Secured Claim**").

B.     On account of the Second Loan, Second Loan Documents and POC. No.3, the Lender asserts a second priority secured claim against the Atlantic Property and the Lender's other collateral in the amount in excess of $930,000 (the "**Asserted Second Priority Secured Claim**").

The Asserted First Priority Secured Claim and the Asserted Second Priority Secured Claim are sometimes collectively referred to herein as the "**Asserted Secured Claims**".

C.      Pursuant to the Loan Documents and the Foreclosure Judgment interest on the Asserted Secured Claims has accrued and continues to accrue at the rate of 12% per annum (the "**Default Rate**").

D.      Both the Parties are desirous of resolving all issues between them and liquidating the Atlantic Property expeditiously consistent with the Trustee's duties under Section 704(a)(1) and other applicable provisions of the Bankruptcy Code, and have engaged in extensive communications and discussions concerning the relative merits of the Parties' positions, and the most appropriate and fair mechanism for the Trustee's liquidation of the Atlantic Property, resulting in the agreement set forth in this Stipulation.

**NOW THEREFORE**, the Parties hereby stipulate and agree, through their undersigned counsel, and intending to be bound, as follows:

1.      **Incorporation of Recitals**.  The foregoing recitals are hereby incorporated herein by reference hereby, are expressly acknowledged and agreed to by the Parties, and shall have the same force and effect as if in the body of this Stipulation.

2.      **Bankruptcy Court Approval**.  This Stipulation is subject to the Bankruptcy Court so-ordering this Stipulation. If this Stipulation is not "So-Ordered" by the Bankruptcy Court, then this Stipulation shall be void *ab initio.*

3.      **Allowance of The Lender's Claims and Liens**.

(a)      The Trustee has reviewed and investigated the Loan Documents and the Asserted Secured Claims and has determined in his business judgment that it is in the best interest of the Debtor and the Debtor's estate to enter into this Stipulation.

(b) The Lender's claim under the First Loan Documents and POC No. 2 is hereby permanently settled, fixed, liquidated and allowed in the following sums (the aggregate amount set forth below in this Section 3(b) is hereinafter referred to as the "**Allowed First Priority Secured Claim**"): (i) sum of $4,852,159.57,[3] as of November 30, 2020, **PLUS** (ii) interest at the rate of 12% per annum on the Base Judgment Amount of $3,133,589.20 from December 1, 2020 until the date that all obligations under the First Loan Documents are paid in full by the Trustee and the Debtor's estate, **PLUS** (iii) all protective advances (including, without limitation, all Lender Advances, as defined below), and all fees, costs, expenses (including, without limitation, attorneys' fees and expenses), and reasonable attorneys' fees and expenses incurred by the Lender after December 1, 2020, plus interest thereon at the rate of 12% per annum from the date of payment thereof or advance by Lender until the date that all obligations under the First Loan Documents are paid in full by the Debtor.

(c) The Lender's claim under the Second Loan Documents and POC No. 3 is hereby permanently settled, fixed, liquidated and allowed in the following sums (the aggregate amount set forth below in this Section 3(c) is hereinafter referred to as the "**Allowed Second Priority Secured Claim**"): (i) the sum of $872,133.37 as of November 30, 2020, plus (ii) interest at the rate of 12% on such sum from December 1, 2020 until the date that all obligations under the Second Loan Documents are paid in full by the Trustee and the Debtor's estate, plus (iii) all protective advances (including, without limitation, all Lender Advances, as defined below) and all fees, costs, expenses (including, without limitation, attorneys' fees and expenses), and all

---

[3] This sum includes interest, default rate interest, attorneys' fees and expenses and protective advances only through November 30, 2020. For the avoidance of doubt, all advances (including without limitation all Lender Advances) made by the Lender on or after December 1, 2020 (together with interest thereon at the rate of 12% per annum from the date of any advance) and the amount of any Carve Out Expenses shall be automatically added to the amount of, and be part of, each of the Allowed Secured Claims.

reasonable attorneys' fees and expenses incurred by the Lender after December 1, 2020, plus interest thereon at the rate of 12% per annum from the date of payment thereof or advance by Lender until the date that all obligations under the Second Loan Documents are paid in full by the Debtor. The Allowed First Priority Secured Claim and Allowed Second Priority Secured Claim are (i) sometimes hereinafter referred to collectively as the "**Allowed Claims**" or "**Allowed Secured Claims**"; and (ii) are sometimes hereinafter referred to individually as an "**Allowed Claim**" or an "**Allowed Secured Claim**").

(d)     The Allowed Secured Claims hereby forever constitute an allowed, legal, valid, binding, enforceable and non-avoidable claims and obligations of the Debtor and the Debtor's estate, and are not subject to any offset, setoff, defense, counterclaim, recoupment, deduction, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law. Neither the Debtor, the Debtor's estate nor the Trustee possesses or will assert any claim, counterclaim, setoff or defense of any kind, nature, or description which would in any way affect the validity, amount, enforceability, and non-avoidability of any part of either of the Allowed Secured Claims. Nothing in this Stipulation shall in any way whatsoever limit or reduce any obligations of the Guarantor concerning or with respect to the any of the Loan Documents or the Lender's Allowed Secured Claims, including without limitation, for any interest accruing under the Loan Documents after the Petition Date. The Lender expressly reserves any and all rights to pursue any claims against any third parties, including without limitation, BMSL, SK, the Guarantor and any other guarantor or obligor of or under the Loans and Loan Documents. Any compromise in the amount of the Lender's claims pursuant to this Stipulation is not intended to, and shall not, inure to the benefit of BMSL, the Guarantor or any other guarantor or obligor of or under the Loans and Loan Documents.

(e)     As of the Petition Date, the Allowed Secured Claims are fully secured pursuant to the Loan Documents by valid, perfected, enforceable and non-avoidable first priority and second priority security interests,[4] mortgages and liens granted by the Debtor to the Lender upon all of the collateral and mortgaged property (including, without limitation, the Atlantic Property) described in the Loan Documents existing as of the Petition Date and all rents, issues, profits, proceeds, and products thereof whether generated, arising or existing prior to or after the Petition Date (collectively, together with any other property of the Debtor's Estate (as used herein "**Estate**" shall include all items included under Section 541 of the Bankruptcy Code) in which a mortgage, security interest or lien was granted to the Lender (or Lender's predecessors in interest) prior to the Petition Date, being referred to herein as "**Pre-Petition Collateral**"), which liens of the Lender are senior to all other liens on the Pre-Petition Collateral. The Trustee, the Debtor, and the Estate will not assert any claim, counterclaim, setoff, or defense of any kind, nature or description which would in any way affect the validity, amount, enforceability and non-avoidability of any part of the Allowed Secured Claims or any of the Lender's claims, liens, mortgages, or security interests in any of the Pre-Petition Collateral. The acknowledgment and agreement by the Trustee and Debtor's Estate, of the Allowed Secured Claims and the liens, rights, priorities and protections granted to or in favor of the Lender as set forth herein and in the Loan Documents and this Stipulation shall constitute a valid proof of claim on behalf of the Lender in this case and the Bankruptcy Court hereby orders that the Lender shall not be required to file any further proof of claim in this bankruptcy case. Without limiting the foregoing, (i) all proceeds of any sale of the Atlantic Property (including, without limitation, any proceeds substitutions and replacements of

---

[4] For the avoidance of doubt, the first priority lien is pursuant to the First Loan Documents and Allowed First Priority Secured Claim, and the second priority lien is pursuant to the Second Loan Documents and Allowed Second Priority Secured Claim.

the Atlantic Property, including without limitation, from any closing of a sale of the Atlantic Property, any contract rights with respect to any contract to sell the Atlantic Property, and any deposits and other amounts to which the Trustee is entitled from any contract or attempt to sell the Atlantic Property); and (ii) all rents, use and occupancy amounts and/or fees from any tenants or any other persons with respect to the Atlantic Property (collectively, the "**Rents**"), in each case (i) and (ii) whether existing or arising before, on or after the Petition Date constitute part of the Lender's Pre-Petition Collateral and the Lender has: (i) pursuant to the First Loan Documents and Allowed First Priority Secured Claim, a perfected, non-avoidable first priority security interest, mortgage and lien therein and thereon; (ii) pursuant to the Second Loan Documents and Allowed Second Priority Secured Claim, a perfected, non-avoidable second priority security interest, mortgage and lien therein and thereon.

(f)     As adequate protection to the Lender for the liens, rights, priorities, claims and protections granted to it pursuant to the Loan Documents and this Stipulation, the Lender is hereby granted: (a) replacement liens on all property of the Debtor's Estate, including without limitation, the Atlantic Property, Rents, contract rights, deposits, cash collateral, and bank accounts of the Debtor and its Estate (whether in the name of the Debtor or the Trustee, and including, without limitation, the Rent Account, as defined below), and on any "Jarnail Singh Claims" (as defined below),  all of the foregoing whether existing or arising before, on or after the Petition Date (collectively, the  "**Replacement Liens**"), to secure the Allowed Secured Claims and the Lender's claims hereunder, which Replacement Liens (i) shall be and shall continue to be first and senior in priority to all other interests, security interests, mortgages, liens and encumbrances of every kind, nature and description, whether created consensually, by an order of this Bankruptcy Court or any other court, or otherwise, including, without limitation, liens or interests granted in favor of third

parties in conjunction with Sections 363, 364, and/or any other Sections of the Bankruptcy Code or other applicable law, and (ii) shall not at any time whatsoever be made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim against any property of the Trustee or the Debtor's Estate, whether any such liens now exist or are hereafter created, pursuant to Sections 363 or 364 of the Bankruptcy Code or otherwise; and (b) a priority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code in the amount of any decline in the value of any Pre-Petition Collateral and any Rents or other property of the Debtor's Estate paid by the Trustee to any third person from and after the Petition Date (the "**Adequate Protection Administrative Claim**") having priority over all any and all other administrative claims and other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the Debtor or the Trustee (or any successor trustee in this case), including, without limitation, any and all administrative expenses of the kinds specified or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, and other Sections of the Bankruptcy Code, and shall at all times be senior to the rights of the Trustee, any successor trustee, or any creditor or other party in interest in this case or any subsequent proceedings or cases under the Bankruptcy Code; provided, however, the Replacement Liens and Adequate Protection Administrative Claim shall be subject and subordinate in all respects to the Carve Out Expenses (as defined in Paragraph 8 below), and shall not apply to the proceeds of any cause of action of the Debtor's Estate under Chapter 5 of the Bankruptcy Code (other than the Jarnail Singh Claims, as defined below) .

(g)     This Stipulation shall be sufficient and conclusive to effectuate the priority, perfection, and validity of the security interests and  liens granted hereby, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing,

registration, recording, possession or control with respect to the Rents and the Estate's bank accounts (including, without limitation, the Rent Account) or other act to validate or perfect such security interest, mortgage, or liens including, without limitation, any control agreements with any financial institutions, banks or securities intermediary holding any depository, brokerage, or securities account consisting of any collateral of the Lender.

4. **Management and Sale of the Atlantic Property**. The Trustee will proceed expeditiously with the marketing and sale of the Atlantic Property (the "**Sale**") pursuant to Section 363 and other applicable provisions of the Bankruptcy Code in a manner that the Trustee and the Lender agree will maximize the value of the Atlantic Property and liquidate the Atlantic Property as quickly as possible. The marketing plan, the method and terms of sale, and the mechanics of the auction will be subject to the Lender's consent and the Bankruptcy Court's approval. The Trustee will seek the Bankruptcy Court's approval of the proposed auction and sale mechanics and procedures.

5. **Retention of Broker**. Subject to the Bankruptcy Court's approval, the Trustee will retain Maltz Auctions Inc. (the "**Broker**") to market and sell the Atlantic Property. The Broker will be entitled to compensation and reimbursement of expenses, of no greater than (i) a buyer's premium of three and one-half (3.50%) percent of the amount of the successful bid at an auction of the Atlantic Property, if the Atlantic Property is sold to a person that is not the Lender (or any designee or assignee thereof), or (ii) a commission of three quarters of one (0.75%) percent of the amount of the successful bid at an auction of the Atlantic Property if the Lender who is the party to this Stipulation (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) acquires the Atlantic Property by a Lender Bid (as defined below). The terms of sale for any Sale shall provide, among other things,

that all bidders other than the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) shall pay a buyer's premium of three and one-half (3.50%) percent of the sale price.

6. Intentionally Omitted.

7. **<u>Management of the Property Pending Sale</u>**.

(a) <u>Operation of the Atlantic Property</u>. The Trustee will manage the Atlantic Property until consummation of the Sale or the Trustee's abandonment of the Atlantic Property pursuant to Section 554(a) if the Trustee in his sole discretion after a sound exercise of his reasonable business judgment determines that the Atlantic Property cannot or should not be sold by the Trustee.

(b) <u>Operating Budget</u>. The Trustee will create and propose to the Lender a budget (the "**Budget**") to operate the Atlantic Property. A Budget that has been approved in writing by the Lender is referred to herein as an "**Approved Budget**". All operating expenses shall require prior written approval by the Lender prior to incurrence and payment by the Trustee. For the avoidance of doubt, the Lender cannot be compelled to make any Lender Advance (as defined below) as part of a Budget or otherwise without the Lender's express consent.

(c) <u>Rental Income</u>. All Rents, if any, collected by the Trustee will be held in a segregated bank account of the Trustee (the "**Rent Account**"). All Rents and funds in the Rent Account shall constitute "cash collateral" (as defined in Section 363(a) of the Bankruptcy Code), and part of Lender's Pre-Petition Collateral and the Lender shall also have a Replacement Lien thereon. For the avoidance of doubt, the Trustee hereby grants the Lender a first priority lien on all Rents arising after the Petition Date and all proceeds thereof (including without limitation all funds) in the Rent Account and the Lender hereby has a perfected and unavoidable lien and security

interest in all cash collateral and the Rent Account, which liens secure the Lender's Allowed Secured Claims. The Trustee shall not deposit any monies other than Rents into the Rent Account. The Trustee is authorized to pay expenses related to the Atlantic Property directly from the Rents deposited in the Rent Account, provided that such expenses are set forth in an Approved Budget or are otherwise expressly approved by the Lender.

(d) <u>Protective Advances</u>. In the event the Rents are insufficient to pay an expense from an Approved Budget or any other expense that the Trustee requests to pay in order to sell or preserve the value of the Real Property, then in the Lender's sole and absolute discretion the Lender may pay such item directly (or may advance the Trustee the funds to pay such item) and any such expenses paid or advanced by the Lender shall be deemed to be a necessary protective advance pursuant to the Loan Documents (each a "**Lender Advance**"). Pursuant to and in accordance with the Loan Documents, any and all Lender Advances shall accrue interest at the rate of 12 % per annum, and shall be automatically part of, and increase the amount of, the Lender's Allowed Secured Claims.

8. **<u>Carve Out of Liens</u>**. The Lender's liens, claims and security interests in the Atlantic Property shall be subject only to the right of payment of the following expenses ("**Carve Out Expenses**"):

(a) Subject to the terms and conditions of this Stipulation, in the event of the closing of a sale of the Atlantic Property, which sale is conducted in accordance with terms and conditions of this Stipulation, subject to the Lender's rights to oppose any motion of the Trustee for approval of the Sale to the successful bidder after an auction, the commissions (but not expenses) of the retained Broker but only to the extent: (i) the Lender has agreed in writing to the retention of such particular broker(s) and the terms and fees (in the form of a buyer's premium)

and/or commissions thereof; (ii) in the event that the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) is not the successful bidder at an auction of the Atlantic Property and such successful bidder takes title to the Atlantic Property, such fees (in the form of a buyer's premium) does not exceed the aggregate sum of three and one-half (3.50%) percent of the amount bid by such successful bidder, but only to the extent that such fees are actually paid by such successful bidder (in the form of a buyer's premium in excess of the sale price at auction); and (iii) in the event that the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) is the successful bidder at an auction of the Atlantic Property and takes title to the Atlantic Property, such commissions do not exceed the aggregate sum of three quarters of one (0.75%) percent of the amount bid by the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) (the applicable amount set forth in this Paragraph 8(a) is referred to herein as the "**Broker Carve Out**");

(b)     Subject to the terms and conditions of this Stipulation, the sum of $275,000.00 plus the amount, if any, of an "Enhanced Amount", as defined below (collectively the "**Estate Carve Out**" or "**Estate Pot**"). The Estate Carve Out shall be used to pay (i) the reasonable commissions, fees and expenses of the Trustee approved by a final order of the Bankruptcy Court pursuant to Section 326 of the Bankruptcy Code ("**Allowed Trustee Fees**"); (ii) the reasonable fees and expenses actually incurred and approved by a final order of the Bankruptcy Court pursuant to Sections 327, 328, 330, or 331 of the Bankruptcy Code (collectively, "**Allowed Professional Fees**") by the attorneys and accountants retained under Section 327 of the Bankruptcy Code by the Trustee (collectively, the "**Professionals**"); and (iii) a potential

distribution to other creditors of the Estate in accordance with the priority set forth in the Bankruptcy Code. Notwithstanding anything to the contrary, the Estate Pot shall include the Enhanced Amount, if and only if, the Sale Proceeds (as defined below, and for the avoidance of doubt, exclusive of any buyer's premium and amounts to clear title) exceed the sum of $5,000,000.00. The "**Enhanced Amount**" shall mean the sum equal to: (x) 0.025 multiplied by (y) the sum that is equal to (i) the amount of Sale Proceeds paid in cash to the Trustee at the closing of the Sale (excluding the amount of any buyer's premium and excluding the amount of any taxes or similar amounts that are paid at closing in order to remove any liens, charges or violations on the Atlantic Property) **MINUS** (ii) $5,000,000.00.

9. **Prohibited Uses of the Estate Carve Out**. Notwithstanding anything to the contrary in this Stipulation, the Estate Carve Out shall not be used to pay any Allowed Professional Fees incurred in connection with any of the following: (a) a request to use any cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Lender, (b) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to Sections 364(c) or (d) of the Bankruptcy Code or otherwise other than from the Lender unless such other financial accommodations repay to the Lender the Lender's Allowed Secured Claims and all other amounts owed to the Lender, indefeasibly and in full, simultaneously within the closing of any such other financial accommodations, (c) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Lender or any of its respective officers, directors, members, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from the Lender under Chapter 5 of the Bankruptcy Code, or (d) any act which has or could have the effect of materially and adversely modifying or compromising any of

the rights and remedies of the Lender, or which is contrary, in a manner that is material and adverse to the Lender to any term or condition set forth in or acknowledged by this Stipulation or any of the Loan Documents.

10. Intentionally Omitted.

11. **All Payments Reduce Estate Carve Out**. Any payment or reimbursement made either directly by or on behalf of the Lender at any time or by or on behalf of the Trustee in respect of any Allowed Professional Fees, Allowed Trustee Fees, or any fees and expenses of the Trustee or any of the Trustee's Professionals prior to the approval thereof by this Bankruptcy Court shall, in either case, permanently reduce the amount of the Estate Carve Out on a dollar-for-dollar basis. The Lender's obligation to fund or otherwise pay the Estate Carve Out and the other Carve Out Expenses is hereby added to and made a part of the amount the Lender's Allowed Secured Claims, secured by the Pre-Petition Collateral, and the Lender is hereby entitled to all of the rights, claims, liens, priorities and protections under this Stipulation, the Loan Documents, the Bankruptcy Code, and/or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of the Lender (or by or on behalf of the Trustee), shall not, and shall not be deemed to, reduce the amount of either of the Lender's Allowed Secured Claims and shall not, and shall not be deemed to, subordinate (i) any of the Lender's liens and security interests in the Pre-Petition Collateral or other collateral granted hereby or (ii) the Lender's Adequate Protection Administrative Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Estate Carve Out and the other Carve Out Expenses, the Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees or disbursements of the Trustee or any Professionals incurred in connection with this case (or any subsequent case under any Chapter of the Bankruptcy Code), and nothing in this

Stipulation shall be construed to obligate the Lender in any way, to pay compensation to or to reimburse expenses of the Trustee or any Professional, or to ensure that the Trustee or the Estate has sufficient funds to pay such compensation or reimbursement.

12.     **Reservation of Rights to Object to Fees**. Each of the Parties reserves the right to object to the allowance of any fees, expense or commissions sought to be paid to the Trustee or any Professionals, all of which are subject to allowance by the Bankruptcy Court.

13.     Intentionally Omitted.

14.     **Purchaser Responsibilities**.  Unless otherwise agreed by the Lender, the terms of sale proposed by the Trustee with respect to any Sale of the Atlantic Property shall require that the purchaser(s) of the Atlantic Property will (a) pay any part of the purchase price solely by wire transfer and (b) be responsible for the payment of: (i) any buyer's premium to the Broker (provided that neither the Lender nor any designee or assignee thereof shall be required to pay any buyer's premium, as long as such designee or assignee is affiliated with the Lender, and is not an unrelated third party); (ii) any real property taxes and transfer taxes; and (iii) any amounts due on account of fines and violations.

15.     **Lender's Right to Credit Bid**.

(a)     Notwithstanding anything to the contrary whatsoever, the Lender (or its designee or assignee) may, at any Sale of all or any part of the Real Property, credit bid (a "**Lender Credit Bid**") all or any part of each of its Allowed Secured Claims, up to the full amount of the Allowed Secured Claims plus all Lender Advances, pursuant to any terms of sale. Furthermore, notwithstanding anything to the contrary, the Lender (or its designee or assignee) shall not be required to deliver any deposit to the Trustee or to pay any buyer's premium at any time.  In the event that any Lender Credit Bid is deemed the highest and best offer and the Sale is made to the

Lender (or its designee or assignee), then any commissions due the Broker will be paid by the Trustee from the Lender Bid Cash Component (as defined below).

(b)     If and only if (i) the Lender (or its designee or assignee) is the successful bidder at a Sale of the Atlantic Property on account of a Lender Credit Bid and (ii) the bid actually submitted by the Lender (or its designee or assignee ) (such actual bid being the "**Lender Bid**") did not include at least $1,000,000 in cash in excess of the Lender Credit Bid, then notwithstanding that the Lender (or its designee or assignee) submitted a Lender Credit Bid, at the actual closing of the Sale of the Atlantic Property, the Lender Bid shall be deemed modified to be as follows:

> The Lender Bid shall be (i) $1,000,000 in cash (the "**Lender Bid Cash Component**"), **PLUS** (ii) a credit bid in an amount equal to: (x) the amount of the Lender Bid, less (y) the amount of the Lender Bid Cash Component (such modified credit bid amount being the "**Resulting Credit Bid**").

16.     **Payment of The Lender's Allowed Secured Claims and Lender's Deficiency Claim**.

(a)     No later than one (1) business day following the clearance of any proceeds of sale of the Atlantic Property whether from a third-party bidder or from the Lender Bid Cash Component (collectively, the "**Sale Proceeds**"), the Trustee shall initiate a wire transfer to the Lender (pursuant to such wire instructions as the Lender shall provide to the Trustee) in an amount equal to the gross amount of all the Sale Proceeds, plus all Rents collected and then held by the Trustee, with respect to the Atlantic Property, less (i) the amount of a 0.75% Broker's commission, and (ii) the sum of $275,000.00 plus (iii) the amount, if applicable, of an Enhanced Amount (the

amount to be paid to the Lender pursuant to this Section 16 (a) being referred to herein as the "**Lender Payment**").[5]

(b)    In the event that the Sale Proceeds from all Sales of the Atlantic Property are not sufficient to pay the Lender's Allowed Secured Claims in full, then the Lender shall automatically have a deficiency claim (the "**Deficiency Claim**") on account of both its Allowed First Priority Secured Claim and its Allowed Second Priority Secured Claim in the amount equal to the sum of:

(i)    the amount of the Lender's Allowed Secured Claims on the date of the Lender's receipt of the Lender Payment; **PLUS**

(ii)    any amount of Sale Proceeds, if any, required to be paid to NYC under Paragraph  22 below; **PLUS**

(iii)    the amount of the Lender Bid Cash Component, if the Lender (or its assignee or designee) is the purchaser of the Atlantic Property and such amount was paid to the Trustee; **LESS**

(iv)    the amount of the Lender Payment; **LESS** (but, if and only if the Lender or its assignee or designee is the purchaser of the Atlantic Property and made a Lender Credit Bid)

(v)    (A) if the Lender Bid Cash Component was paid to the Trustee, the amount of the Resulting Credit Bid, or (B) if no Lender Bid Cash Component was paid to the Trustee, the amount of the actual Lender Credit Bid.

---

[5] The Trustee has explained to the Lender the United States Trustee's general limitations on the use of wire transfers pursuant to Section 5(F)(2) of the United States Trustee's Handbook for Chapter 7 Trustee, effective October 1, 2012, and requested to make this payment by Estate check.  The Lender insisted that the payment be made by wire and that it was a material condition to entry into this Stipulation.

The Deficiency Claim shall be an allowed claim, enforceable against the Debtor, the Estate and all obligors under the Loan Documents. Lender's Deficiency Claim shall have the following priorities in the Debtor's Chapter 7 bankruptcy case:

(x) Lender shall have a super priority administrative claim under Section 507(b), 507(a)(2), and 364(c), subject only to the Carve Out Expenses, in the amount of equal to the aggregate of (a) all Carve Out Expenses paid or payable to any person or entity, (b) the buyer's premium, if any, paid in connection with the Sale, and (c) all protective advances made by the Lender from and after December 1, 2020 (including, without limitation, the aggregate amount of all Lender Advances), which claim shall be senior to all other administrative claims in the Debtor's Chapter 7 case; and

(y) the balance of the amount of the Deficiency Claim in excess of the amount set forth in subclause (x) of this Section 16(b) immediately hereinabove, will be a general unsecured claim in the Debtor's Chapter 7 case.

17. The Lender shall not be entitled to share in the Estate Pot on account of its Deficiency Claim unless and until all other claims are paid in full. For the avoidance of doubt, the Lender shall be entitled to share in all other assets of the Estate and receive distributions on account of its Deficiency Claim.

18. **Lien On Jarnail Singh Claims**. (a) The term "**Jarnail Singh Claims**" shall mean any and all claims and causes of action of any kind whatsoever of the Debtor and/or the Estate (including, but not limited to, any avoidance actions and any and all Chapter 5 claims), against Jarnail Singh, SK, BMSL, RR and/or any other affiliate, relative, successor, transferee or assignee of any of the foregoing (all of the foregoing persons and entities, together with Jarnail Singh, are collectively referred to herein as the "**Jarnail Related Persons**". For the avoidance of doubt, (i)

the Jarnail Singh Claims shall not include any claims of the Lender against Jarnail Singh or any of the other Jarnail Related Persons, including, but not limited to the Deficiency Claim, any claims under any of the Loan Documents, and any claims under that certain Stipulation of Settlement, dated September 2020 signed by RR, A.J. Singh, and Jarnail Singh, and their respective attorneys, in that certain action captioned <u>Nicole Katsorhis, temporary receiver v. Richi Rich Restaurant, A.J. Singh, "XYZ Corp", et. al.</u>, in the Civil Court of the City of New York, County of Queens, bearing Index No. L&T 52740/2019; and (ii) the Lender is hereby granted relief from the automatic stay under Section 362(a) to in any way commence, continue, prosecute, collect and enforce in any way those claims to extent the Lender elects to do so in the Lender's sole discretion. Within 90 days after the closing date of the Sale of the Atlantic Property (such 90th day being referred to herein as the "**Election Date**"), the Trustee shall confer with the Lender as to the prosecution of the Estate's Jarnail Singh Claims. In the event that on or prior to the Election Date, the Trustee commences any actions based on the Jarnail Singh Claims and at least $250,000 of the Estate Pot has been paid to (or set aside for payment to) the Trustee for the Allowed Trustee Fees and Allowed Professional Fees, then any recovery on the Jarnail Singh Claims shall be paid to the Lender after payment of all reasonable and allowed professional fees and expenses of the Trustee (to the extent incurred by the Trustee after the closing date of the Sale) and Trustee commissions, in each case directly associated with the recovery on the Jarnail Singh Claims, up to the amount of the Deficiency Claim. The Trustee shall (i) seek authority to make such payment to the Lender promptly after the Trustee's receipt of any recovery from any of the Jarnail Singh Claims; and (ii) not settle or abandon any of the Jarnail Singh Claims that are the subject of any action or proceeding commenced by the Trustee without the Lender's prior written consent. All of the Jarnail Singh Claims, as to which the Trustee has not commenced an action on or prior to the Election Date, are

hereby automatically deemed forever transferred and assigned by the Trustee and the Debtor's Estate to the Lender (such claims being referred to herein as the "**Assigned Jarnail Singh Claims**"), as of the Election Date, without any additional consideration therefore and without the need for any other act or document whatsoever. The Lender may abandon and may commence, prosecute, collect, enforce, settle, collect on any and all of the Assigned Jarnail Singh Claims in such manner as the Lender elects, in the Lender's sole and absolute discretion, without the consent or approval of any person and without the requirement of Bankruptcy Court approval. The Bankruptcy Court shall retain non-exclusive jurisdiction to hear any Assigned Jarnail Singh Claims.

(b)     To the extent that the Lender pursues any Assigned Jarnail Singh Claims against Jarnail Singh Related Persons, then the Debtor's Estate shall be entitled to five (5%) percent of the net proceeds of the recovery on those claims after payment of all fees and expenses, including, without limitation, all attorneys' fees and expenses, of the Lender associated with the prosecution and/or recovery on all of the Deficiency Claim and all Assigned Jarnail Singh Claims (including but not limited to the Assigned Jarnail Singh Claim that is the subject of any recovery). The Lender shall promptly make such payment to the Trustee after such recovery has become indefeasible. The Lender's attorneys' fees and expenses shall not be subject to the approval of the Bankruptcy Court. The Lender shall be free to abandon or settle any or all of the Assigned Jarnail Singh Claims at any time whatsoever without the consent of the Trustee or approval of the Bankruptcy Court.

(c)     If and only if both (i) the Lender pursues any Assigned Jarnail Singh Claims against Jarnail Singh Related Persons; and (ii) the First Foreclosure Action and the Second Foreclosure Action have been removed to the Bankruptcy Court and are thereafter actually

adjudicated by the Bankruptcy Court, then the Trustee shall be entitled to two and one-half (2.5%) percent of the net proceeds of the recovery on those claims after payment of all fees and expenses, including, without limitation, all attorneys' fees and expenses, of the Lender associated with the prosecution and/or recovery on the Deficiency Claim and all Assigned Jarnail Singh Claims against any persons and entities. The Lender shall promptly make such payment to the Trustee after such recovery has become indefeasible. The Lender's attorneys' fees and expenses shall not be subject to the approval of the Bankruptcy Court. The Lender shall be free to abandon or settle the Deficiency Claim without the consent of the Trustee or approval of the Bankruptcy Court.

19. **Trustee's and Trustee's Professionals Administrative Costs and Compensation**. Except for the Carve Out Expenses, no costs or expenses of administration which have been or may be incurred in this case at any time shall be charged against the Lender or any of the Lender's collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the Lender.

20. **Modification of the Automatic Stay**. The automatic stay imposed under Section 362(a) of the Bankruptcy Code shall be, and hereby is, vacated with respect to the continuation of the First Foreclosure Action and /or the Second Foreclosure Action and the enforcement of the Deficiency Claim in such manner the Lender may decide in its sole discretion, provided, however, that the Lender will not seek any relief against the Debtor in connection with the First Foreclosure Action and /or the Second Foreclosure Action that is inconsistent with this Stipulation.

21. **Prosecution of the Foreclosure Actions**. The Lender may prosecute the First Foreclosure Action or the Second Foreclosure Action, including claims against all Jarnail Related Persons and all other persons without interference by the Trustee. Specifically, the Trustee and the Debtor's Estate do not object to the Lender's continuation of the First Foreclosure Action

and/or the Second Foreclosure Action or to the removal of either or both such actions to the Bankruptcy Court.

22. **New York City**. Notwithstanding any other provision in this Stipulation and for avoidance of doubt, the Lender's Allowed Secured Claims (including any Lender Advances) shall not, at any time, prime any statutory liens of the City of New York ("**NYC**") that may attach to the Lender's pre-Petition or post-Petition collateral, including any Replacement Liens that may be granted to the Lender pursuant to this Stipulation, for unpaid real estate taxes, water and sewer charges, emergency repair liens or other liens of the same priority under the New York City Administrative Code, in all such cases solely to the extent that the NYC liens are senior to the Lender's liens under applicable state law.

23. **Binding Terms**. The terms of this Stipulation shall be binding upon all parties in interest. The Lender's Allowed Secured Claims shall constitute: (i) allowed secured claims, not subject to subordination and otherwise unavoidable, for all purposes in this case, other than as specifically set forth herein, (ii) the prepetition liens of the Lender on or related to the Lender Collateral, which shall be deemed legal, valid, binding, perfected, not subject to defense, claim, counterclaim, re-characterization, offset of any kind, subordination, and otherwise unavoidable, and (iii) associated prepetition liens, which shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's Estate against the Lender all of which have been forever waived and released.

24. **Amendment and Waivers**. This Stipulation may not be modified, amended, waived, changed or terminated orally, but only by an agreement in writing, signed by all Parties and approved by order of the Bankruptcy Court.

25. **Complete Agreement**. This Stipulation constitutes the entire agreement and understanding between and among the Parties relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings (written or oral), among the parties hereto with respect to such subject matter.

26. **Binding Effect**. Upon Bankruptcy Court approval of this Stipulation, this Stipulation will be binding upon the Trustee, the Debtor's Estate and the Lender, and their successors and assigns. The provisions of this Stipulation, and any and all rights, remedies, privileges, and benefits in favor of the Lender provided or acknowledged in this Stipulation, and any actions taken pursuant thereto, shall be effective immediately upon this Stipulation being "So-Ordered" or the entry of an order by the Bankruptcy Court approving this Stipulation pursuant to Bankruptcy Rules 6004 and 7062 (and any stay is hereby dispensed with), shall continue in full force and effect, and shall survive entry of any such other order, including, without limitation, any Order which may be entered by the Bankruptcy Court, including any Order dismissing this case or abandoning the Atlantic Property. Any Order dismissing this case under Section 707(a) of the Bankruptcy Case or otherwise, or permitting the abandonment of the Atlantic Property shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (a) the Lender's liens in all of its collateral shall continue in full force and effect notwithstanding such dismissal or abandonment until all obligations have been paid to the Lender in full; and (b) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal or abandonment, for the purposes of enforcing the claims of the Lender and its liens in any collateral.

27. **Choice of Law and Jurisdiction**. This Stipulation shall be construed, and the rights and liabilities of the Parties hereto shall be determined, in accordance with the laws of the State of New York and applicable federal law. The Parties hereby consent to the resolution of any

and all disputes arising under, in connection with or relating to this Stipulation, and any claims or actions based upon this Stipulation, by and under the jurisdiction of the Bankruptcy Court.

28.     **Further Assurances**.  Each Party agrees at any time and from time to time at each such Party's own expense, upon request of a Party hereto, as applicable, to promptly execute, deliver, or obtain or cause to be executed, delivered or obtained any and all further instruments and documents and to take or cause to be taken all such other action such Party, as applicable, may deem reasonably desirable in obtaining the full benefits of this Stipulation.

29.     **Headings: Interpretation**. Section and subsection headings are for convenience of reference only, are not part of this Stipulation and shall not affect the construction of, or be taken into consideration in interpreting, this Stipulation. For purposes of this Stipulation: (i) the term "including" shall be deemed to mean "including, without limitation,"; (ii) the term "person" means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited liability company, unincorporated organization or association, or trustee; and (iii) whenever the context of this Stipulation reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. This Stipulation has been prepared and drafted through a joint effort of the Parties hereto and, therefore it shall not be construed against any of the Parties as the person who prepared or drafted this Stipulation.

30.     **Execution in Counterparts**.  This Stipulation may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   This Stipulation may be executed by electronic signatures, including without

limitation, by PDF, and all electronic signatures shall have the same force and effect as an original signature.

31.     **Expenses**.  Each Party shall pay its own fees, costs, expenses and disbursements in connection with the preparation, execution and delivery of this Stipulation and each of the other documents executed in connection herewith and the transactions contemplated hereby.

32.     **Successors and Assigns**. This Stipulation shall be binding on and inure to the benefit of the successors and assigns of each of the Parties.

33.     **RR Adversary Proceeding**.  Withing five days after execution of this Stipulation, the Trustee shall (i) file a motion in the Debtor's main Chapter 7 case authorizing the Trustee to sell the Atlantic Property free of (a) any alleged lease of RR or rights of RR and Jarnail Singh, (b) any tenants whatsoever, and (c) any right of any person or entity to possess or use the Atlantic Property (or any portion thereof), and directing all persons and entities to vacate the Atlantic Property (the "**Sale Free and Clear Motion**"); and (ii) file a dispositive motion seeking a judgment in the RR Adversary Proceeding, among other things (a) granting a declaratory judgment that RR and Jarnail Singh have no lease or right to use the Atlantic Property, and (b) authorizing the Trustee to sell the Atlantic Property free of any alleged lease or rights of RR and free of any tenants and free of any right of any person to possess or use the Atlantic Property.

34.     **Sale Free and Clear of Any Rights to Lease Or Use Atlantic Property**. This Stipulation is subject to the occurrence of the "Free and Clear Condition". The term Free and Clear Condition shall mean that both (i) the Bankruptcy Court has entered an order approving the Sale Free and Clear Motion (the "**Free and Clear Order**"), and (ii) the form the Free and Clear Order has been approved by the Lender.  The Free and Clear Condition may be waived by the Lender in the Lender's sole and absolute discretion, provided that such waiver must be expressly made in a

writing. If the Free and Clear Condition does not occur or has not been expressly waived by the

Lender in writing, then this Stipulation shall be void *ab initio*.

Dated:  New York, New York
        February 12, 2021

**KENNETH SILVERMAN, CHAPTER 7 TRUSTEE**

By: *s/ Kenneth Silverman*
    Kenneth Silverman, not individually but solely in his
    capacity as Chapter 7 Trustee of the Estate of Atlantic
    111st LLC

Dated:  New York, New York
        February 12, 2021

**SILVERMAN ACAMPORA LLP**

By: *s/ Brian Powers*
    Brian Powers, Esq.
    100 Jericho Quadrangle Suite 300
    Jericho, New York 11753
    Tel: (516) 479-6357
    Email: bpowers@silvermanacampora.com
    *Counsel to Kenneth Silverman,*
    *Chapter 7 Trustee*

Dated:  New York, New York
        February 11, 2021

**MLF3 ATLANTIC LLC**

By: *s/ Jason Leibowitz*
Name: Jason Leibowitz
Title: Manager

Dated:   New York, New York
         February 11, 2021                    **KATSKY KORINS LLP**


                                          By: *s/ Steven H. Newman*
                                               Steven H. Newman, Esq.
                                               605 Third Avenue
                                               New York, New York 10158-0038
                                               Tel: (212) 716-3235
                                               Email: snewman@katskykorins.com


                                               *Counsel to MLF3 Atlantic LLC*



**"SO-ORDERED"**

This _____ day of _____ 2021


_____
United States Bankruptcy Judge